

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**Gary Keith Morris**
    Plaintiff

CASE NUMBER: A18CV0042LY

**International Business Machines Corporation**
    Defendant

## COMPLAINT

Now Comes Gary Keith Morris, Plaintiff *pro se*, and would show the following:

1. **Plaintiff**

    Gary Keith Morris

    1508 Church Street

    Bastrop, TX 78602

2. **Defendant**

    International Business Machines Corporation

    1 New Orchard Road

    Armonk, NY 10504-1722

3. **Jurisdiction**

    This Court has proper jurisdiction under 28 U.S.C. Section 1332 (a) (1), which grants original jurisdiction to U.S. district courts over cases between citizens of different states when the matter in controversy exceeds $75,000. Plaintiff is a resident of the state of Texas and Defendant is a resident of the state of New York where Defendant's principal place of business, Defendant's corporate headquarters, is located. Defendant is further a resident of the state of New York because Defendant

is incorporated in New York state. The amount is controversy is unpaid commissions in the amount of $449,206 plus interest and expenses. Therefore, this Court has original jurisdiction because the case is between citizens of two different states for an amount in controversy that exceeds $75,000. Venue is proper in this Court because Plaintiff resides in the Western District, Austin Division and was employed and resided in the Western District, Austin Division for the entirety of Plaintiff's employment with Defendant and performed the work which is the basis of this Complaint in the Western District, Austin Division.

4. **State Law**

Texas state law applies to this matter as all the work performed by Plaintiff was performed in the state of Texas for Defendant. The Plaintiff only resided in and worked for Defendant in Texas for the mater in controversy. Defendant is legally entitled to conduct business in Texas and has a registered agent for service of process in Texas. Defendant has multiple offices in Texas and thousands of employees in Texas.

5. **Background Facts**

Defendant hired Plaintiff on May 6, 2013 to work in the Emptoris software business group within Defendant's software global business unit. Plaintiff was assigned to Oil & Gas accounts including ConocoPhillips. Plaintiff was offered and accepted an Incentive Plan Letter ("IPL") for the second half of 2013. The IPL specified Plaintiff's quota targets and how Plaintiff would be paid for achieving the sales targets defined within the IPL. The IPL had complex formulas and rules for complying with revenue requirements and to determine how much commission would be paid. The form, substance, amounts, calculations, deliberations, rules, policies, requirements, and quotas were determined and established by

2

Defendant in its sole discretion and according to Defendant's extensive and complex rules, formulas, policies and procedures for the determination of sales quotas and commission payment requirements. Plaintiff achieved approximately one half of the target and was paid accordingly under the agreed to IPL.

6. During the period from January 1, 2014 through June 30, 2014, Plaintiff was offered and accepted a new 6-month IPL. Plaintiff complied with the terms of the IPL and Defendant paid Plaintiff accordingly under the agreed to IPL.

7. During the period from July 1, 2014 through December 31, 2014, Plaintiff was offered and accepted a new 6-month IPL. Plaintiff complied with the terms of the IPL and Defendant only partially paid Plaintiff according to the agreed to IPL terms.

8. In early 2014, ConocoPhillips, a longtime user of Emptoris solutions, expressed serious dissatisfaction with Defendant for failings in Defendant's Emptoris software products. Furthermore, ConocoPhillips expressed a desire to stop using Defendant's Emptoris solutions and to switch to a competitive solution. A right that ConocoPhillips possessed under ConnocoPhillips' existing legacy agreements with Defendant. This would have resulted in no additional Emptoris revenue for Defendant.

9. Plaintiff diligently studied the complex rules for Defendant to book new revenue and the complex rules for Plaintiff's IPL so that Plaintiff could create a significant new event that would result in dramatic new revenue for Defendant and large commissions for Plaintiff. Plaintiff's goal was to deliver enough revenue under Employee's agreed to IPL that would have paid Plaintiff $1 Million in commissions. This was a real stretch goal that Plaintiff felt was possible and provided Plaintiff with the incentive, energy, and determination to work with a difficult customer and a difficult Defendant's support organization to make this

3

transaction happen.

10. Plaintiff solely developed and created a business case which would allow ConocoPhillips to decrease their total long-term lifecycle costs for Emptoris software while delivering additional revenues for Emptoris software solutions to Defendant. Plaintiff spent 4.5 months in daily negotiations with ConocoPhillips to develop and execute a new standard license agreement with ConocoPhillips. The agreement eliminated a variety of unacceptable terms in ConocoPhillips' legacy Emptoris agreements, reduced Defendant's legal exposure, and delivered additional revenues to Defendant according to all the complex rules and requirements for Defendant to recognize or book new revenue for Emptoris software at ConocoPhillps. The total annual value of the new contracts for new SaaS software product catalog numbers was $1,366,190 and the total contract value was $2,166,380. Defendant booked the full value of the new contracts and Plaintiff was complimented by Plaintiff's 1st, 2nd, 3rd and 4th line managers on performing a tremendous turnaround. Plaintiff received full booking credit of two times the annual contract value of $1,366,190 or $2,732,380 which increased Plaintiff's achievement results to 2,482% of sales quota for the SaaS category. According to Plaintiff's IPL, Plaintiff would be paid at $15,453 for up to 100% of plan. Plaintiff would then be paid 4 X $15,453 for performance between 100% and 200% of plan. From 200% of plan to 10,000% of plan Plaintiff would be paid 2 X $15,453 ($30,906) for each increment of 100% of quota. Therefore, Plaintiff's IPL called for Plaintiff to be paid the following:

  0-100% Quota of $110,090 = $15,453

  100-200% of Quota of $110,090 = 4 X $15,543 = $61,812

  200-2,482% of Quota of $110,090 = (2 X $15,453) X ((2,732,380 – 220,180)/110,090) = $705,260

  Total = $782,525

11. Plaintiff was partially paid up to 100% of plan in the amount of $15,452.89. Plaintiff was then informed that any sales person that exceeds 400% of plan must have their compensation reviewed and approved by an executive of Defendant. Plaintiff received an additional $317,866 on March 31, 2015. This left a total shortfall of **$449,206**.

12. In Defendant's presentation document titled "Our Purpose, Values & Practices – Your 2014 Incentive Plan – Individual Quota Plan (IQP) – Employees" on page 12 clearly states "Payments uncapped".

13. Plaintiff received a "PBC 1 among the top contributors this year" rating for 2014 and 2015. Defendant's automated internal systems recorded that Plaintiff had sales credit as described above. Defendant made a manual deduct entry to artificially reduce Plaintiff's attainment to the 100% level and never readjusted these reports or systems. Employee has copies of these reports showing Employee's achievement. The $317,866 was a manual payment.

14. During the period from January 1, 2015 through June 30, 2015, Plaintiff was offered and accepted a new 6-month IPL. Plaintiff complied with the terms of the IPL and Defendant paid Plaintiff accordingly under the agreed to IPL.

15. During the period from July 1, 2015 through December 31, 2015, Plaintiff was offered and accepted a new 6-month IPL. Plaintiff complied with the terms of the IPL and Defendant paid Plaintiff accordingly under the agreed to IPL.

16. During the period from January 1, 2016 through March 31, 2016, Plaintiff was offered and accepted a new 3-month IPL. Plaintiff complied with the terms of the IPL and Defendant paid Plaintiff accordingly under the agreed to IPL

17. During the period from April 1, 2016 through June 30, 2016, Plaintiff was offered and accepted a new 3-month IPL. Plaintiff complied with the terms of the IPL and Defendant paid Plaintiff accordingly under the agreed to IPL.

18. During the period from July 1, 2016 through December 31, 2016, Plaintiff was offered and accepted a new 6-month IPL. Plaintiff complied with the terms of the IPL and Defendant paid Plaintiff accordingly under the agreed to IPL.

19. Plaintiff has repeatedly requested that Defendant comply with the terms of the 2H 2014 agreed to IPL. Defendant has refused. An Affidavit as to these facts is attached hereto and marked as "Exhibit 1".

20. **Causes of Action**

    **Breach of Contract**

    Texas Courts have clearly articulated the requirements for a contract. Under Texas law, parties enter into a binding contract when the following elements exist: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Winchek v. Am. Express Travel Related Servs. Co.*, 232 S.W.2d 197, 202 (Tex. App. –Houston [1st Dist.] 2007, no pet.

21. Furthermore, the Texas Supreme Court has held that these elements may be proven by the parties' conduct and course of dealing. The Court has stated, "The conduct of one party, from which the other may reasonably draw the inference of a promise, is effective in law as such." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609-610 (Tex. 1972).

6

22. Texas courts have stated, "An implied contract arises from the dealings of the parties, from which the facts show that the minds of the parties met on the terms of the contract without any legally expressed agreement thereto."

23. Defendant has clearly entered into a Contract with Plaintiff. The elements required to show a contract are present. Defendant's repeated and ordinary course of dealings with Plaintiff demonstrate that both parties viewed the IPL as a contract. Defendant repeatedly adhered to the terms of the various IPL's and paid Plaintiff under the terms. These dealings between the parties demonstrate a meeting of the minds and satisfy the requirements to demonstrate a valid contract under Texas State Law.

24. Plaintiff will further show that either an Express or Implied contract exists between Defendant and Plaintiff.

25. Under Texas Law, there are four elements for a breach of contract claim: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.-Houston [1st Dist.] 2009, pet. denied).

26. Defendant had a contractual obligation to pay the offered commissions once the Plaintiff had performed the required actions. Failure to make these commission payments in the full amount constitutes breach of an Express or Implied contract. Plaintiff was damaged by the amount of the unpaid commissions. Therefore, all the elements for a successful breach of contract claim are present in this case.

27. In the alternative Plaintiff pleads the following:

**Quantum Meruit**

The Texas Supreme Court has defined Quanutm meruit as follows:

Quantum meruit is an equitable theory of recovery which is based on an implied agreement to pay for benefits received. To recover under the doctrine of quantum meruit, a plaintiff must establish that: 1) valuable services and/or materials were furnished, 2) to the party sought to be charged, 3) which were accepted by the party sought to be charged, and 4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient. *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

28. Plaintiff provided valuable services to deliver the $2,166,380 in new total committed contracts and revenue to Defendant. Defendant gladly and aggressively accepted these benefits. Plaintiff reasonably expected Defendant to fulfill the obligations of the IPL and pay the earned commissions just as the Defendant has done on numerous other occasions before and after the facts in this case. Therefore, Plaintiff is entitled to payment of the full promised commission of $782,525 less prior payments of $317,866 leaving a balance due of $449,206 plus interest from the time that the full payment should have been made on March 31, 2015.

29. Plaintiff hereby demands a jury trial on the facts herein.

WHEREFORE, PLAINTIFF *pro se*, GARY KEITH MORRIS, requests that:

1. Plaintiff be granted judgment on all Plaintiff's claims and be awarded $449,206 plus interest from March 31, 2015 at the rate of 6% per annum;

2. Plaintiff be granted judgment for all court costs incurred;

3. Plaintiff be granted all reasonable attorney's fees; and

4. Plaintiff be granted such other and further relief, special or general, legal or equitable, to which Plaintiff may be justly entitled.

Respectfully submitted,

*Gary Keith Morris*

**Gary Keith Morris**
**1508 Church Street**
**Bastrop, TX 78602**
**(512) 716-5235**